National Bank of Republic v. Young.

The National Bank of Republic, of New York, appellant,

v.

Edward C. Young, receiver of the Joseph Dixon Crucible Company, respondent.

1. A corporation created for the purpose of carrying on a manufacturing business, has implied power to make negotiable paper for use within the scope of its business, but no power to become a party to bills or notes for the accommodation of others.

2. Where a corporation has power, under any circumstances, to issue negotiable paper, a *bona fide* holder has a right to presume that it was issued under the circumstances which give the requisite authority, and such paper is no more liable to be impeached for any infirmity in the hands of such a holder than any other commercial paper.

3. Mere notice of facts such as would put a prudent person upon inquiry, which inquiry, if pursued, would have disclosed the infirmity of the paper, is not sufficient to impeach the title of the holder of negotiable paper taken for value before maturity, so as to let in defences to which the paper would be subject in the hands of the original party.

4. The right of such a holder to recover can be defeated only by proof of such circumstances as show that he took the paper with knowledge of some infirmity in it, or with such suspicion with regard to its validity as that his conduct in taking it was fraudulent.

On appeal from a decree of the court of chancery, advised by Vice-Chancellor Van Fleet, who filed the following conclusions:

The question the court is called upon to decide on this application is whether or not the petitioners had, at the time they made the loan of December 31st, 1880, knowledge of the fact that the fourteen notes of the Dixon Crucible Company, which they then held as collateral to other loans, were accommodation notes, or notice of such facts as imposed upon them the duty of further inquiry before acting. Notice or knowledge, in this connection, does not mean that the maker of the paper must bring home to its holder actual knowledge of the infirmity which renders the paper valueless, but it will be sufficient if it is shown that he had the means of knowledge, that is, that he had notice of such facts as would have led a prudent man to further inquiry, which inquiry, if pursued, would have disclosed the infirmity of the paper. *Hamilton* v. *Vought, 5 Vr. 187.*

The proof is undisputed that the fourteen notes were without consideration, and consequently unenforceable between the original parties. Mr. Walker, the secretary of the insolvent corporation, swears positively that they were all accommodation paper. The fact that Mr. Lewis, the cashier of Fowler, Crampton & Co., is unable to corroborate his evidence on this point, or to point out which of the fourteen notes are business paper and which were issued for the accommodation of the payees, does not impair the force of Mr. Walker's evidence in the slightest degree. All that Mr. Lewis says, on this point, is that he has not sufficient knowledge of the fourteen notes to enable him to say that they were all issued by the insolvent corporation for the accommodation of Fowler, Crampton & Co., but that fact is positively affirmed by Mr. Walker, and until his evidence is overcome the fact must be regarded as established.

The loan in question was made December 31st, 1880. Thomas T. Buckley was one of the persons who acted on behalf of the petitioners in negotiating it. He was their vice-president. On the 28th or 29th of December, 1880, one or two days before the loan was made, the president of the insolvent corporation told Mr. Buckley, while they were both at the office of Fowler, Crampton & Co., that the insolvent corporation had advanced or loaned Fowler, Crampton & Co., a large amount of accommodation

paper, the total of which he stated to be some $600,000.   Mr.. Buckley was not engaged in any business for the petitioners, nor representing them as their agent or officer at the time this communication was made to him, but it was made to him as an individual.   The amount of the loan of December 31st, 1880, was $31,100, and the amount of the collateral specially pledged as security for its payment was $43,000.

These facts present two questions : first, was the notice sufficient? and second, if it was, did Mr. Buckley's knowledge become the knowledge of the petitioners?   There can be no doubt, I think, that if Mr. Buckley had himself been in the place of the petitioners, that is, if he had held the debts which the petitioners did, the announcement that so large an amount of accommodation paper had been issued by his debtor, would have provoked him to the most searching inquiry as to whether any of the paper he held was of that character.   It is possible he had no motive for such inquiry when the announcement was made—the loan which was made one or two days after may not then have been in contemplation—but he gained the knowledge which the announcement gave ; he continued to have such knowledge when the application for a further loan was made—he had obtained it so recently there can be no doubt that it was present in his mind— and it then became his duty to give his principal the benefit of it.   The notice was amply sufficient to put him upon inquiry. It was such as would have led a prudent man, taking reasonable care of his own interests, to make further inquiry, unless he intended to rely exclusively on the collateral specially pledged at the time of the loan.

As a general rule, notice to an agent is notice to his principal. This rule applies to artificial persons as well as to natural persons. It does not, however, apply to cases where an agent or officer of a corporation deals with the corporation for himself in a transaction where his interests are opposed to those of the corporation. *Barnes* v. *Trenton Gas Light Company, 12 C. E. Gr. 33 ; First Nat. Bank of Hightstown* v. *Christopher, 11 Vr. 435.*   Nor where the same agent or officer represents two different corporations in a transaction, in which, to make his scheme successful,

he must withhold information which he possesses from one of them. In such cases the knowledge of the agent is not the knowledge of his principal. *De Kay* v. *Hackensack Water Company, 11 Stew. Eq. 158.* This case falls within none of the exceptions to the general rule.

The application of the petitioners must be denied.

*Mr. William Talcott,* and *Mr. Thomas H. Rodman,* of New York, for the appellant.

*Mr. J. D. Bedle, contra.*

The opinion of the court was delivered by

DEPUE, J.

The Joseph Dixon Crucible Company was incorporated by an act of the legislature of this state, passed March 11th, 1868. *P. L. of 1868 p. 360.* It became insolvent, and passed into the hands of a receiver, January 3d, 1881. The company was engaged in the business of manufacturing, buying, selling and dealing in plumbago, crucibles, pencils, stove-polish &c. The firm of Fowler, Crampton & Co., doing business in New York city, were importers of black lead, clay, chemicals and other articles used by the crucible company in its manufacturing business. The dealings between Fowler, Crampton & Co. and the crucible company, in the sale and purchase of merchandise, were very large. In these transactions Fowler, Crampton & Co. received from the crucible company its promissory notes, which were business paper. Besides these regular business transactions, the parties were in the habit of exchanging paper for accommodation. The paper of the crucible company, which Fowler, Crampton & Co. received, either as regular business paper or for accommodation, that firm was accustomed to have discounted by banks in New York city—mainly by the National Bank of Republic. The account between the firm and the crucible company was kept as a running account, and no distinction was made between the regular business paper and accommodation paper. When notes were received they were credited, and when merchandise was delivered it was charged all in the same account. On the

3d of January, 1881, when the crucible company went into the hands of a receiver, there was of this paper made by the crucible company outstanding $614,000, of which about ten per cent. was business paper. Fowler, Crampton & Co. failed about the time of the failure of the crucible company, and made an assignment for the benefit of their creditors.

The crucible company, as a corporation engaged in business, had implied power to make negotiable paper for use within the scope of its business, but it had no power, express or implied, to become a party to bills or notes for the accommodation of others, and such paper is valid and enforceable only in the hands of a holder taking the same before maturity, *bona fide* and without notice. *1 Dan. on Neg. Inst.* §§ *382, 386 ; Green's Brice's Ultra Vires 255, 272.* The general doctrine of the law is that where a corporation has power under any circumstances to issue negotiable paper, a *bona fide* holder has a right to presume that it was issued under the circumstances which give the requisite authority, and such paper is no more liable to be impeached for any infirmity in the hands of such a holder than any other commercial paper. *Gelpcke v. City of Dubuque, 1 Wall. 175, 203 ; Supervisors v. Schenck, 5 Id. 772, 784 ; Hackensack Water Co. v. DeKay, 9 Stew. Eq. 548.* This doctrine is applied to commercial paper made by a corporation for the accommodation of a third person when in the hands of a *bona fide* holder, who has discounted it before maturity on the faith of its being business paper. *Mechanics Banking Association v. White Lead Co., 35 N. Y. 505 ; Bird v. Daggett, 97 Mass. 494 ; Monument National Bank v. Globe Works, 101 Id. 57.*

At the time of the failure of the crucible company the National Bank of Republic had under discount three promissory notes made by the crucible company, amounting to $19,655.57, which had been regularly discounted before maturity for the benefit of Fowler, Crampton & Co., and also held fourteen other notes made by the crucible company, aggregating $90,751.13, as collateral security for the unpaid balance of $86,280.43, due on notes of Fowler, Crampton & Co., discounted for that firm by the bank. All of the notes above mentioned

having been discounted or taken as collateral security before maturity, and without notice of any infirmity in the consideration, the vice-chancellor recognized them as valid in the hands of the bank for the amounts above named.

On the 31st of December, 1880, the bank loaned to Fowler, Crampton & Co. $31,100, taking as collateral therefor merchandise, from which has been realized $18,718.66, and also the fourteen notes of the crucible company which had previously been pledged to the bank for the antecedent loans above mentioned. The aggregate amount of these fourteen notes exceeds the indebtness of Fowler, Crampton & Co. to the bank prior to December 31st, 1880, in the amount of $4,470.70; and the question is whether the bank shall be allowed the sum of $4,470.70 in the adjustment of its claim against the estate of the crucible company in the hands of the receiver. The vice-chancellor disallowed this part of the bank's claim, on the ground that before the loan to Fowler, Crampton & Co. of December 31st, 1880, the bank had such information with respect to the character of the paper as that in accepting it as collateral security for the loan of that date, it became in that respect a holder *mala fides*. The transaction upon which this conclusion was based was as follows: by the testimony of Buckley, who was the vice-president of the bank, and personally acted for the bank in negotiating the loan of December 31st, it appears that on the 28th or 29th of December, in an interview with the president of the crucible company, the latter told him that Fowler, Crampton & Co. held some $600,000 of borrowed paper of the crucible company. Upon this testimony the vice-chancellor remarked that "the notice was amply sufficient to put him upon inquiry; it was such as would have led a prudent man, taking reasonable care of his own interests, to make further inquiry." And in the statement of the principle by which his judgment should be governed, the vice-chancellor laid down the doctrine of the law to be that "notice or knowledge, in this connection, does not mean that the maker of the paper must bring home to its holder actual knowledge of the infirmity which renders the paper valueless, but it will be sufficient if it is shown that he had the means of knowledge; that

National Bank of Republic *v.* Young.

is, that he had notice of such facts as would have led a prudent man to further inquiry, which inquiry, if pursued, would have disclosed the infirmity of the paper."

This statement of the doctrine of notice in its effect with respect to the *bona fide* character of a transaction, as a general rule, is undoubtedly correct; but it is inapplicable to negotiable commercial paper, which, in virtue of its commercial character, and the need of sustaining its negotiable quality, cannot be impeached in the hands of a subsequent holder taking it for value before maturity, unless his title was acquired under such circumstances as show actual fraud in the party so taking it.

In *Gill* v. *Cubitt, 3 B. & C. 466*, the court of king's bench held that the title of the holder of commercial paper was impeached so as to let in defences to which such paper would have been subject in the hands of the original party, where it appeared that he had taken it under circumstances " which ought to have excited the suspicion of a prudent and careful man." But the doctrine of that case has been overruled in England and in the supreme court of the United States, and generally in the courts of sister states. *Goodman* v. *Harvey, 4 A. & E. 870; Goodman* v. *Simonds, 20 How. 343; Murray* v. *Lardner, 2 Wall. 110; 1 Dan. Neg. Inst.* § *775.*

*Gill* v. *Cubitt* was signally repudiated by the supreme court of this state in *Hamilton* v. *Vought, 5 Vr. 187*. In that case an instruction by the trial judge that if the holder acquired title to the note under circumstances which would have put a person of ordinary prudence upon his guard, the note was invalid in his hands if its inception had been fraudulent, was held to be erroneous, and the rule adopted was that the title of the holder of a note taken for value before maturity was not impeached by the fact that he took it under suspicious circumstances, unless the circumstances were such as to prove *mala fides*, and that carelessness in taking the note would not impair the holder's title unless the carelessness was so gross that bad faith might be inferred from it. In *Murray* v. *Lardner*, Mr. Justice Swayne, speaking on the subject, said that " suspicion of defect of title, or the knowledge of circumstances which would

excite such suspicion in the mind of a prudent man, or gross negligence on the part of the taker, at the time of the transfer, will not defeat his title ; that result can be produced only by bad faith on his part." In the latest case on this subject in the English courts, Lord Blackburn declared "it to be fully and thoroughly established that if value be given for a bill of exchange, it is not enough to show that there was carelessness, negligence or foolishness in not suspecting that the bill was wrong, when there were circumstances which might have led a man to suspect that. All these are matters which tend to show that there was dishonesty in not doing it, but they do not in themselves make a defence to an action upon a bill of exchange." *Jones* v. *Gordon, L. R. (2 App. Cas.) 616, 628.*

Upon principle, as well as by the weight of authority, it is settled that mere notice of facts, such as would have put a prudent person upon inquiry, is not sufficient to impeach the title of the holder of negotiable paper taken for value before maturity and his right to recover can be defeated only by proof of such circumstances as show that he took the paper with knowledge of some infirmity in it, or with such suspicion with regard to its validity as that his conduct in taking it was fraudulent. Tested by this principle, it is clear that the defence in this case cannot be maintained. The sales of merchandise made by Fowler, Crampton & Co. to the crucible company were very large, and their transactions were closed, from time to time, by the receipt of the notes of the company, which Fowler, Crampton & Co. were in the habit of having discounted. Much of this paper had been discounted by the petitioners, and at maturity was paid by the checks of the crucible company. Mr. Pullen, the cashier of the bank, testified that applications for the discount of or loans upon these notes as collateral were invariably made by William C. Fowler, of the firm of Fowler, Crampton & Co., and that whenever he was asked he always said that the notes were legitimate business paper, given for merchandise, and not accommodation paper. Mr. Buckley, the vice-president, testified that the representation made by Mr. Fowler was that the paper was entirely business paper ; that his firm was doing a large

amount of business with the Dixon Crucible Company, and that they held several hundred thousand dollars worth of the paper most of the time. Mr. Buckley also testified that he often inquired of Fowler whether any of the paper was accommodation paper; that Fowler's reply was "No; it is all business paper;" and that he (Mr. Buckley) never had any idea but that it was all strictly business paper.

The only evidence tending to show knowledge that the paper now in question was taken in bad faith is the testimony of Mr. Buckley that on the occasion heretofore referred to, the president of the crucible company told him that Fowler, Crampton & Co. held some $600,000 of borrowed paper of the crucible company. This conversation occurred at the place of business of Fowler, Crampton & Co., and seems to have been a mere casual conversation, which made no impression upon Mr. Buckley, for he is uncertain as to the precise time when it took place. The information given was not that all the paper taken by Fowler, Crampton & Co. then outstanding was accommodation paper. We think the evidence insufficient to show bad faith in Buckley in afterwards making the additional loan of December 31st, 1880, on the pledge of the notes of the company the bank then held as collateral security for prior loans.

The petitioner should be allowed the sum in controversy, and the order disallowing it should be set aside, and an order be made in accordance with this opinion.

*Order unanimously reversed.*