10 N.J. Super. 545 (1950)
77 A.2d 255
ALFRED E. DRISCOLL, GOVERNOR OF THE STATE OF NEW JERSEY, ET AL., PLAINTIFFS,
v.
BURLINGTON-BRISTOL BRIDGE COMPANY, ET AL., DEFENDANTS.
Superior Court of New Jersey, Chancery Division.
Decided December 5, 1950.
*551 Mr. Walter D. Van Riper, Special Counsel to the Attorney General, and Mr. Theodore D. Parsons, Attorney General of the State of New Jersey, for the plaintiffs (Mr. Paul N. Belmont, of counsel).
Mr. Robert L. Hood and Mr. Thomas D. Begley for the defendants Burlington County Board of Freeholders and Burlington County Bridge Commissioners, et al.
Mr. Milton M. Unger for the defendant Sarjem Corporation, et al. (Messrs. Milton M. and Adrian M. Unger, attorneys).
Mr. Donald B. Kipp for the defendants Chemical Bank & Trust Company and B.J. Van Ingen & Co., Inc. (Messrs. Pitney, Hardin & Ward, attorneys).
Mr. Thomas M. Farr for the defendant Buckley Securities Corporation (Messrs. Norcross, Farr & Schantz, attorneys).
Mr. George W.C. McCarter for the defendant Stranahan, Harris & Co., Inc. (Messrs. McCarter, English & Studer, attorneys).
Mr. James D. Carpenter for the defendant Bacon, Stevenson & Co., et al. (Messrs. Carpenter, Gilmour & Dwyer, attorneys).
Mr. Harold A. Price and Mr. Edward L.C. Vogt for the defendant Estabrook & Co., et al. (Messrs. Schenck, Price, Smith & King, attorneys).
*552 Mr. Alfonse F. Spiegel for the defendant Tripp & Co. (Messrs. Harrison & Roche & Darby, attorneys).
Mr. Edward A. Markley for the defendant Fitzgerald & Co. (Messrs. Markley & Broadhurst, attorneys).
FREUND, J.S.C.
This proceeding was brought by the Governor and the Attorney General of the State of New Jersey on behalf of the people of the State, for rescission of the purchase of two toll bridges across the Delaware River from Burlington County, New Jersey, to points in Pennsylvania.
On the morning of October 22, 1948, the Board of Chosen Freeholders of Burlington County, by resolution, created the Burlington County Bridge Commission, a public body, and appointed three bridge commissioners. Minutes after their appointment and organization, these bridge commissioners, without notice to the public, without independent investigation, without independent appraisal, without negotiation or bargaining, without independent counsel or advise, adopted a resolution for the purchase of the two bridges at a price of $12,000,000 to be derived from the issuance of revenue bonds. The same day, in the City of New York, they closed the transaction. The sellers of the bridges, without investing a single dollar, realized a net profit of about $2,000,000. The various stages of the entire transaction down to the smallest detail were planned by the sellers prior to the creation of the Commission. One of them arranged the selection of the commissioners. The sellers' attorney prepared all the papers and documents including the Commission's resolutions, even before the commissioners were appointed. They made the financial arrangements for the Commission. Though this transaction, the subject of this litigation, was formally initiated and concluded by the Commission on the first day of its existence, the arrangements for it by the defendants had extended for a period of about two years, and involved many persons. The proofs establish a course of conduct replete *553 with chicanery on the part of the sellers and those acting on their behalf.
Viewed in the large and applying legally sanctioned standards relevant to the conduct of governmental affairs to the uncontradicted facts, the conclusion is inescapable that the transaction contravenes sound public policy. From the evidence it cannot be sustained.
The facts are these:
The Burlington-Bristol Bridge was constructed in 1931 and was owned by the Burlington-Bristol Bridge Company. The Tacony-Palmyra Bridge, constructed in 1929, was owned by the Tacony-Palmyra Bridge Company. Both companies were incorporated under Chapter 247, P.L. 1925, R.S. 48:5-13 et seq. This statute reserved to the State of New Jersey the right in conjunction with the Commonwealth of Pennsylvania to acquire the bridges five years after their completion at a prescribed cost formula, and provided for their reversion to the State without cost after 50 years. Appropriate federal laws pertinent to interstate bridges empowered acquisition by New Jersey or Pennsylvania or any political subdivision thereof. Under the cost formula the two bridges would have become available in 1951 for approximately $5,000,000. However, the enactment of Chapter 401, P.L. 1947, R.S. 48:5-18, eliminated the State's right of acquisition of the bridges if they became the property of a public body.
Chapter 318, P.L. 1946, R.S. 27:19-26 et seq., authorized each county board of freeholders to create a bridge commission with power to acquire bridges, subject to the approval of the freeholders, and the consent of an adjoining state, and to issue bonds secured by the revenue from such bridges. In 1948, this statute was amended by deleting the requirement for the consent of the adjoining state. Chapter 288, P.L. 1948, R.S. 27:19-28.
The legislative background of this case is more fully stated in the opinion of Judge Jacobs in Haines v. Burlington County Bridge Commission, 1 N.J. Super. 163 (App. Div. 1949).
*554 The stock of the Burlington-Bristol Bridge Company from its incorporation in 1928 had been owned by a small group in Pittsburgh, Pennsylvania. The defendant, Theodore R. Hanff, had been for many years a bridge painting contractor and because of his extensive experience in this business, was familiar with the operation of toll bridges and bridge companies. He knew the owners of the bridge company stock. From time to time, he had had transactions with the defendants, Ketcham and Nongard, of Chicago, dealers in bridge securities. In the latter part of 1946, he proposed to them and others of the defendants that they become associated in purchasing the stock of the Burlington-Bristol Bridge Company with the idea of selling it to a public agency. A syndicate was formed, composed mainly of Thomas J. Christensen, a municipal bond dealer; Rickard Parks, an investment security dealer; Robert K. Bell, counsel for a Bridge Commission; and Clifford R. Powell, counsel and former director of the Burlington-Bristol Bridge Company, all of whom are defendants. Hanff was authorized by the syndicate to purchase the stock for not more than $1,500,000. He negotiated with the Pittsburgh stockholders a purchase of their stock at a price of $1,350,000, requiring no cash investment. A loan in the amount of $1,000,000 secured by a purchase money mortgage encumbering the bridge was obtained and the balance of the purchase price, $350,000, was represented by notes of the bridge company secured by the pledge of the stock. The syndicate, however, was required to pay into the company $25,000 for working capital.
Each member of the syndicate had his role to play: Hanff, the negotiations with the Pittsburgh stockholders; Ketcham & Nongard, the financing of the purchase, by securing the $1,000,000 mortgage on the bridge; Christensen and Parks were to have sold preferred stock, but this became unnecessary when the sellers accepted notes. Bell's contribution was to be in the rendition of advice in the acquisition and operation of the bridge. Powell's task  and he so testified  was the sale to Burlington County. On cross-examination, he *555 said, "I became interested in getting the bridge to present it to Burlington County."
Since 1914 Powell has been a lawyer with offices in Mount Holly, the county seat of Burlington County. He served in the State Legislature as Assemblyman and subsequently for three terms as Senator. In 1937, he was a candidate for the Republican nomination for Governor of the State. For years he had been generally recognized as the Republican leader of Burlington County. His law firm represented 15 of the 35 municipalities comprising the county, and he had been counsel to the Burlington-Bristol Bridge Company since its incorporation. In addition to his professional and political activities, he had been active in the military service and had been Commanding General of the National Guard. Powell's disclaimer of political influence is, in the light of the known facts, disingenuous, to say the least. His financial contribution to the undertaking was one-fourth of the total sum of $25,000 advanced to the bridge company by the syndicate as working capital; his real contribution consisted of his influence. Its potency was demonstrated in the following episode: The right to acquire the two bridges was reserved to the State by Chapter 247, P.L. 1925, R.S. 48:5-22, 23 and 24. This statutory reservation came to the knowledge of the syndicate after Hanff had completed his arrangements for the purchase of the Burlington-Bristol stock, in the course of Ketcham & Nongard's negotiations for the mortgage. It was necessary to remove this right of the State, lest the whole plan of the syndicate be frustrated. Accordingly, Albert McCay, an Assemblyman from Burlington County, Powell's law partner, introduced a bill, later enacted into law as Chapter 401, P.L. 1947, R.S. 48:5-18, providing that if a public agency acquired the bridges, the State's right of acquisition would be extinguished. To ensure its passage, Powell wrote to the Senator from Burlington County asking his support of the legislation. In the letter dated April 4, 1947, Powell said that the legislation "permits our local bridge companies to sell their bridges either to a private individual or corporation *556 or to a public bridge commission. This is only a permissive act, and it is desired by the Burlington-Bristol Bridge Company." Significant is the omission of any reference to the further provision which expressly eliminated the State's right to acquire the bridges.
After the enactment of this necessary amendment, the syndicate acquired the stock of the Burlington-Bristol Bridge Company as planned. They elected themselves directors and officers, and thereafter operated the bridge.
Having acquired the Burlington-Bristol Bridge, the syndicate members decided to purchase the Tacony-Palmyra Bridge. The stock of the Tacony-Palmyra Bridge Company was owned by some 1,300 stockholders located in various states. The syndicate was not equipped to negotiate such an acquisition. Ketcham & Nongard Knew Robert M. Sherritt, president of the Sarjem Corporation, whose business was the buying and selling of bridges and other utilities. Sherritt had been interested in the purchase of the Tacony-Palmyra Bridge some years before, but had never acquired it. In April or May, 1948, he was introduced to Hanff. Eventually an agreement was reached between Sherritt and the syndicate for the acquisition of the stock of the Tacony-Palmyra Bridge Company. Thereafter Sherritt, without the investment of any money, acquired options, to be exercised not later than November 1, 1948, for the purchase of the stock at $6,487,500. The syndicate agreed to buy from Sherritt for $6,700,000.
In the meantime, the syndicate was proceeding with its plans for the sale of the two bridges to a public agency. Although no such agency had been created and the members of the Board of Freeholders of Burlington County had no knowledge of the syndicate's plan that it should create one, the sellers were meticulously arranging the details of the transaction. To this end, they retained David M. Wood, of New York, an attorney specializing in municipal law, to represent and advise them in connection with the sale of the bridges and the financing thereof. The syndicate, well in advance of the creation of the Commission, ordered and procured *557 appraisal, traffic and engineering reports from alleged experts in their particular fields. The traffic report was addressed to Messrs. Ketcham & Nongard, but surprisingly, a preliminary appraisal made by the American Appraisal Company, dated October 16, 1948, was addressed to the Board of Chosen Freeholders, although not ordered by them, for as of that date the members of the Board, with one exception, had no knowledge of the transaction.
The one member of the Board of Chosen Freeholders, who, prior to October 20, 1948, knew of the proposed transaction was Frank Snover. On September 7, 1948, while he and Powell were returning from a political meeting, Powell told Snover in confidence that he would shortly disclose to him the details of a project which would be of substantial benefit to Burlington County. On October 3, 1948, Powell and Snover drove to the Hotel Barclay in Philadelphia, where Hanff and Ketcham were introduced to Snover. He was then told that the two bridges were for sale and could be purchased for $12,000,000 by a bridge commission to be created by the Board of Freeholders; that the purchase could be financed by a bond issue of the bridge commission; that the bonds would be neither an obligation of the county, nor of the bridge commission, nor a lien on the bridges, but would be paid solely from the revenues thereof. With respect to the financing, they informed Snover that they would obtain a loan in the sum of $12,400,000, of which $400,000 would provide working capital for the commission. To substantiate the price of $12,000,000, Ketcham said that a report in process of preparation by the American Appraisal Company would value the bridges in excess of $13,000,000. Snover was handed reports on the physical condition of the bridges and a traffic report which estimated the future revenue. He was shown an amortization table, which indicated that in 12 years the revenue would have been sufficient to completely amortize the bonds and leave a surplus of approximately $4,000,000, which would become the property of Burlington County. It was suggested that Snover study the reports and consider the *558 proposition. He was enjoined to keep the matter confidential and to discuss it with no one but Powell.
Although, subsequently, meetings of the Board of Freeholders were held on October 7th and October 15th, Snover, complying with the admonition, made no mention of the matter to his colleagues on the Board of Freeholders. On October 19th, at the specific request of Powell, Snover called the members of the Board of Freeholders to meet at his home on the following evening, October 20th. Powell and four of the five members of the Board attended. To this group, Snover outlined the project. Then Powell took over the discussion and presented the aforementioned reports. In the course of the meeting, Thomas D. Begley, the County Solicitor, arrived. Powell had called on him that very afternoon and discussed the matter with him. He had left with him the reports which had been prepared for the sellers. Begley advised the group that the freeholders had the legal authority to appoint a bridge commission. Amazing as it may seem, there was presented at this meeting, in addition to the various reports, a 38-page printed proposed resolution authorizing the issuance of the bonds by the not-yet created bridge commission, containing in print the names of Howard R. Yocum and Fred C. Norcross, Jr., as two of the three bridge commissioners, although neither of them was aware of his proposed appointment. The name of the third commissioner was left blank. The printed bond resolution had been drafted by David M. Wood, the attorney for the syndicate. The names of Yocum and Norcross had been supplied to him by Ketcham's secretary, who procured them from Powell, who knew both men to be receptive to a public appointment; also, Yocum had served as General Powell's military aide. Before the meeting closed, it was decided that the third member of the commission was to be David Lichtenthal. But, at the close of the meeting, none of the selectees had any knowledge of his proposed appointment as bridge commissioner. The freeholders were told that the deal was a "take it or leave it" proposition at $12,000,000; that the transaction was to be closed within *559 48 hours; that haste and secrecy were essential; and that a meeting between the sellers of the bridges and the bridge commissioners-to-be would be held at the Hotel Barclay in Philadelphia, the following afternoon, October 21st.
Between the meeting at Snover's home on the evening of October 20th and the following afternoon, Yocum, Lichthenthal and Norcross first learned of their proposed appointment as bridge commissioners at an annual salary of $3,000  Yocum was told by Powell; Lichtenthal, by Snover; and Norcross, by Yocum. Powell had telephoned Norcross to accompany Yocum to Philadelphia; en route Yocum told Norcross what was proposed. The meeting was held in Ketcham's hotel suite. There were present Powell, Ketcham and Hanff, as sellers; their attorney, David M. Wood; Clarence G. Price, one of the freeholders; Begley, the County Solicitor; and Yocum, Lichtenthal and Norcross, the not-yet appointed commissioners of the not-yet created bridge commission.
Powell, Ketcham and Wood informed the selectees of the plan. It was presented to them as it had been to the freeholders on the preceding evening  as a "package" deal on a "take it or leave it" basis at $12,000,000. The experts' reports on the bridges prepared for and procured by the sellers were presented. Besides, and most extraordinarily, they were handed prepared contracts between the sellers and the non-existent commission for the sale of the bridges; a contract between Ketcham & Nongard and the non-existent commission whereby the former agreed to buy and the latter agreed to sell the proposed bond issue of $12,400,000; the 38-page printed bond resolution; and a sample printed bond of the yet unborn Burlington County Bridge Commission. Ketcham outlined the financial aspects of the transaction; Wood gave his opinion on the legal details. Questions raised by the commissioners-to-be regarding the various phases were answered by Powell, Ketcham and their attorney, Wood. They were assured and reassured that the transaction could be accomplished, that it would benefit Burlington County and that *560 eventually the county would net a sizeable amount from surplus revenues. They were urged to keep the matter secret and to act speedily, in order to avoid "nuisance" and "taxpayer's" suits.
It is clear from the testimony that any misgivings which the commissioners-to-be may have entertained concerning the proposal as a whole, and such factors as the price, the haste, the secrecy, that all reports were "sellers'" reports, were set at rest by the assurances of the sellers, and more particularly by the advice of Wood, whose eminence they vouched for. Because of a prejudice against notice and publicity by a governmental agency in the purchase of property, he counselled and directed secrecy in the transaction until its completion. He was opposed to informing the public of a proposed public project until it was concluded, saying "that the reason for secrecy in such transactions is the effort to prevent minority interests from exploiting their nuisance value, thus increasing the cost of the properties to the public agency." In his opinion, the idea of "open covenants openly arrived at" is excellent in theory, but does not work out in practice. In his testimony, he admitted that he did not know of any judicial authority for his philosophy of so conducting public business. To give weight to his advice, he cited experiences from his personal practice. Obviously for the purpose of adding prestige to his opinion and impressing the prospective commissioners, there was produced and circulated a printed copy of a speech Wood had delivered before the American Bar Association in which he had expressed the same views. He produced the proposed contracts and resolutions, advised the commissioners-to-be regarding the legal details of the impending transaction, and instructed them regarding the steps to be taken in the execution of the plan.
Undoubtedly, the presence and influence of Powell to whom they owed their selection for office, their own desire for public appointment, plus the overweight of the sellers' business experience in contrast to their own, swayed the appointees and *561 produced the result which the syndicate desired  namely, unqualified acceptance of the entire proposal.
The meeting, which was the dress-rehearsal for the real performance scheduled for the morrow, lasted from mid-afternoon until about nine o'clock in the evening. The commissioners-to-be were briefed on all the successive steps to be taken the following day,  from their appointment in the morning by the Board of Freeholders at Mount Holly, to the closing at the Chemical Bank & Trust Company in New York City later that day. It was also agreed that Yocum was to be chairman of the Commission; Lichtenthal, vice-chairman; and Norcross, secretary-treasurer.
According to plan, the next morning, Friday, October 22, 1948, the Board of Freeholders caucused before its scheduled public meeting at Mount Holly. All the freeholders were now present. Snover told Jones, the member who was absent from the meeting at Snover's home on October 20th, about the proposed transaction and gave him the reports and statistical data for his inspection. Jones testified that he was "shocked" at the haste with which a matter of such complexity and magnitude was to be consummated; nevertheless, after a hasty perusal of the reports he too decided to go along.
The Board of Freeholders then proceeded to its public meeting and formally adopted a resolution creating the Burlington County Bridge Commission and appointing as commissioners Yocum, Lichtenthal and Norcross at an aggregate annual salary of $9,000. Forthwith, the appointees, who with County Solicitor Begley had been nearby, awaiting the action of the Board of Freeholders, held their first meeting. It was attended also by Powell, Ketcham and Wood. With remarkable dispatch, the commissioners proceeded to perform each act outlined for them at the previous evening's meeting. With a celerity which can only be attributed to a total abnegation of independent investigation or judgment, they hastened to adopt by-laws, resolutions, reports and agreements which had been prepared for them in advance. They appointed as traffic engineers the firm which had previously prepared for the *562 sellers a traffic survey of the bridges, and they adopted its report. They appointed as consulting engineer the man who had reported to the sellers on the condition and value of the bridges, and they accepted his report. They adopted a resolution providing for the acquisition of the bridges by the issuance of revenue bonds, asking the Board of Freeholders for its approval, although neither the purchase price of the bridges nor the amount of the bonds was mentioned therein. This resolution was immediately presented to the freeholders, still in session, and they forthwith gave their approval by adopting a resolution, which likewise made no mention of either the price to be paid or the amount of bonds to be issued. Within a matter of minutes, the Bridge Commission adopted the 38-page printed resolution authorizing the issuance of the bonds, setting forth in detail the method of acquisition of the bridges and the application of the proceeds of the bonds. They also voted to execute the various previously prepared contracts  with the sellers of the bridges, with the Chemical Bank & Trust Company as closing agent, and with Ketcham & Nongard for the sale of the bonds. The Commission adopted resolutions appointing Thomas D. Begley, the County Solicitor, as their attorney and retaining "the following law firms, Winston, Strawn, Shaw & Black of Chicago and Wood, King and Dawson of New York City, without compensation, to represent the Commission in the acquisition of the Bridge properties and to do all necessary acts in closing the transaction." Both firms had previously been, and still were, acting as attorneys for the sellers. While the minutes do not record a formal acceptance of the appointment, Wood did in fact represent the commissioners.
The bridge commissioners, accompanied by Powell, Ketcham, Wood and Begley, then journeyed to the Chemical Bank & Trust Company in the City of New York to close the transaction. They reached the bank about two o'clock in the afternoon. All the various documents were in readiness and Wood guided and directed the parties in the execution thereof. In reality, he represented both the sellers and the purchasers.
*563 The closing lasted until midnight. It was attended also by the bank's officers; Hanff, Sherritt, lawyers, accountants, representatives of the mortgage trustees for the two bridges; a representative of a Chicago bank, the escrow agent for the Sarjem Corporation; representatives of B.J. Van Ingen & Co., Inc., syndicate manager for the bond issue; and representatives of other bond houses and insurance companies. The inference is patent that the attendance of such an aggregation must necessarily have been arranged long before the birth of the Commission that morning. Obviously, the closing had been planned by others  the commissioners had no part in it.
The Chemical Bank & Trust Company had had no communication or dealings with any public body or official of Burlington County prior to the closing. Nevertheless, for months it had been negotiating with others, including Ketcham, Nongard and Wood. As early as July, 1948, Ketcham spoke to William G. Laemmel, its investment officer. Subsequently, the bank committed itself to purchase $2,030,000 of the bonds. Loan applications were made by Ketcham & Nongard, and by Robert M. Sherritt on behalf of the Sarjem Corporation; and Leonard M. Horton, in charge of brokers' loans, and Russell H. Sherman, trust officer, were brought into the matter. Early in October, Wendell M. Mooney, senior officer of the trust and loan department, learned of the transaction. By October 22, 1948, the bank had worked out in detail every financial phase of the matter. There had been prepared an eight-page printed closing agenda, which led the participants step by step through a maze of corporate resolutions, charter amendments, certificates, deeds, notes, receipts, bonds  all to the objective, sale of the two bridges to the Burlington County Bridge Commission for $12,000,000 derived from the issuance of $12,400,000 of revenue bonds.
In the course of the closing, the bank made several "wash" loans. Thus, it loaned $6,487,500 to the Sarjem Corporation to enable it to take up the options on the Tacony-Palmyra *564 stock. It loaned $6,700,000 to the Burlington-Bristol Bridge Company to enable it in turn to purchase the Tacony-Palmyra stock from the Sarjem Corporation. The Burlington-Bristol Bridge Company thus became the owner of the second bridge. The bank loaned the sum of $12,400,000 to Ketcham & Nongard and B.J. Van Ingen & Co., Inc., with which they purchased the entire issue of the Commission's bonds, taking their joint note and the bonds as security. From the proceeds of the bond issue, the bank paid off mortgages which were liens on the bridges and notes of $350,000 held by the former stockholders of the Burlington-Bristol Bridge Company.
Powell, Ketcham, Nongard, Hanff and the other syndicate members, as stockholders of the Burlington-Bristol Bridge Company, received $3,450,347 for their stock, which they had acquired without the payment of any cash. After payment of fees and expenses, a net profit of $1,822,492 was distributed among them. The Sarjem Corporation for its services realized a profit of over $200,000. The sum of $700,000 was transmitted by the Chemical to a bank in Philadelphia earmarked for the payment of fees and expenses. Although Wood's services to the Commission were to be "without compensation," it is reasonable to assume that the portion of the $700,000 fund allocated to him was compensation for all services, including the activities attributable to his representation of the Commission.
The syndicate assigned its stock in the Burlington-Bristol Bridge Company to the Burlington County Bridge Commission. During the closing, the commissioners were elected directors and officers of the corporation and executed deeds conveying title to the bridges from the company to the Burlington County Bridge Commission. Before leaving, the commissioners reduced the tolls of the bridges.
From the foregoing facts, it is amply apparent that the commissioners honored their public duty only in the breach; but the following collateral incident is significant: When the Commission acquired all the stock of the Burlington-Bristol Bridge Company, it became the owner of "all properties of *565 the bridge company, real, personal and mixed" including a sum of $550,000 cash on deposit, which could have been used as working capital. Yet, on October 26, 1948, this sum was distributed by the commissioners to the syndicate, the former stockholders. Subsequently, upon the institution of legal proceedings, these moneys were returned.
Before Ketcham & Nongard committed themselves to purchase the $12,400,000 issue of revenue bonds, they had negotiated with the defendant, B.J. Van Ingen & Co., Inc., to participate in the sale of the bond issue. They agreed to form a syndicate for the sale of the bonds, to be managed by Van Ingen & Co. For its participation, B.J. Van Ingen & Co., Inc., anticipated a profit of approximately $290,000 from bond discounts, management fee and profit on the sale of the bonds. For some time prior to the creation of the Commission, the officers of Van Ingen & Co. knew of the proposed venture. If they did not actually know all the manipulations of the bridge sellers' syndicate, they definitely knew before the closing that the Bridge Commission had not been created. Dempsey, a vice-president, testified that he knew on October 15th that there was no bridge commission and Van Ingen, the president, testified that he did not know whether or not there was a bridge commission, that he relied on Ketcham.
B.J. Van Ingen & Co., Inc., solicited bond subscriptions and obtained commitments from a group denominated as the "bond syndicate," defendants herein. None of these subscribers made any investigation or inquiry whatsoever, relying entirely on the representations and assurances of Ketcham, Nongard and Van Ingen, together with Wood's opinion. The first meeting of the bond syndicate was held three days after the closing, on Monday, October 25th, in New York City under the auspices of Van Ingen & Co. Attention was called to two newspaper clippings of October 24th, one from the Newark Sunday News and the other from the New York Herald Tribune, to the effect that the Governor of the State of New Jersey was surprised and disappointed at the sale of the bridges and that there would be an investigation. Despite *566 and disregarding such notice and warning, the various bond houses entered into a written agreement to purchase allotments of bonds, appointing Van Ingen & Co. as their agent and authorizing the substitution of the syndicate's note for the joint note of Ketcham & Nongard and B.J. Van Ingen & Co., Inc., then held by the Chemical Bank & Trust Company. The syndicate note and the bonds as security are still held by the bank.
The following day, October 26th, suit to set aside the transaction was instituted by Henry S. Haines and Richard J. Lippincott, as taxpayers of Burlington County. Upon the filing of the complaint, a restraint issued against the payment of any moneys, except for necessary salary and maintenance charges, and a custodial receiver was appointed. On appeal, the Appellate Division continued the restraint, but vacated the order appointing a receiver, 1 N.J. Super. 163. Subsequently, the Governor and the Attorney General on behalf of the people of the State of New Jersey instituted this proceeding for rescission, which superseded the taxpayers' suit previously filed.
The essence of the plaintiffs' charge is that the contract for the sale of the bridges was obtained by means and methods contrary to law, that it is against public policy and should be rescinded. The defendants deny the charges, and ask that legal sanction be given the transaction, strenuously arguing that the deal is financially profitable to the Bridge Commission and the County of Burlington.
The primary and all-important question is, of course, whether the sale of the bridges was a valid and lawful sale. If it was, the questions pertaining to the bonds are moot. It is only if the transaction is invalid that we need consider the rights and remedies of the bondholders. These then are the basic issues: What were the duties of the commissioners? Were these duties performed? What were the rights and obligations of the defendants in their dealings with these public officers? Were these obligations discharged? Were *567 the acts and conduct of the defendants in conformity with or in violation of public policy?
The members of the Bridge Commission are public officers. 42 Am. Jur., § 30, page 901. The American concept of a public office is that of a public trust created in the interest and for the benefit of the people. 42 Am. Jur., § 8, page 885. 67 C.J.S., § 6, page 116. "The atmosphere of this case prompts us to direct attention to the integrity demanded of those who accept responsibility as public officials. It cannot be too often restated. The administration of government ought to be directed for the good of those who confer and not of those who receive the trust. The officers of government are trustees and both the trust and trustees are created for the benefit of the people." Rankin v. Board of Education of Egg Harbor, 135 N.J.L. 299, 303 (E. & A. 1946); Tuscan v. Smith, 130 Me. 36, 153 A. 289 (Sup. Jud. Ct. Me. 1931). Public officers are obligated, virtute officii, to perform their duties honestly, faithfully, and to the best of their ability, and to bring to the discharge of their duties that prudence, caution and attention which careful men usually exercise in the management of their own affairs. United States v. Thomas, 82 U.S. 337, 21 L.Ed. 89 (1873); State v. Erie Railroad Co., 23 N.J. Misc. 203, 213 (Sup. 1945); 43 Am. Jur., §§ 260 and 261, pages 77 and 78. "Public service demands an exclusive fidelity." Ames v. Montclair, 97 N.J. Eq. 60 (Ch. 1925), at page 65. Diligence, integrity and intelligent discretion in the discharge of their duties are required of public officers. 67 C.J.S., § 114, page 402. Discretionary duty imports the exercise of judgment, wisdom and skill. Paschall v. Passmore, 15 Pa. 295, 304 (Sup. 1850); Commonwealth v. Brownmiller, 141 Pa. Super. 107, 14 A.2d 907 (Super. 1940). When an officer's conduct of the trust is not marked by these qualities, there is mismanagement. In re Marshall, 363 Pa. 326, 69 A.2d 619, 625 (Sup. 1949).
The facts as established by the testimony disclose that the commissioners failed to discharge the duties which devolve *568 upon a public officer. The case is replete with nonfeasances and misfeasances on the part of these officers. Surely, any reasonable business man or honest public official about to embark on a business venture or the purchase of property running into millions of dollars would, as a basis for intelligent action, seek independent appraisals, reports and counsel. Lewis v. Freeholders of Cumberland, 56 N.J.L. 416 (Sup. Ct. 1894). No prudent business man or official relies exclusively upon sellers' appraisals and reports. He would not, within one day, initiate and conclude, without independent investigation or bargaining, a purchase involving millions of dollars. He would not accept unqualifiedly representations and documents furnished by sellers. Yet this is precisely what happened. Yocum, Lichtenthal and Norcross were appointed commissioners at 10 A.M. on October 22, 1948, and before the end of the day completed the purchase of the bridges for $12,000,000. In Peter's Garage, Inc., v. Burlington, 121 N.J.L. 523 (Sup. Ct. 1939); affirmed, 123 N.J.L. 227 (E. & A. 1939), Mr. Justice Perskie succinctly summarized the law, as follows: "The award of a contract by municipal authority must be bottomed upon the exercise of a `discretion within proper limits' (Hahn Motor Truck Corp. v. Atlantic City, 6 N.J. Misc. 234 (Sup. Ct. 1928), upon a `fair and intelligent consideration' thereof (Simmons v. Mayor, &c., Wenonah, Id. 902 (Sup. Ct. 1928)), upon circumstances free from `fraud' (Hammonton v. Elvins, 101 N.J.L. 38 (Sup. Ct. 1925)). In short, `good faith and honesty' are the determinative factors. Ryan v. Paterson, 66 N.J.L. 533, 535 (Sup. Ct. 1901)."
There is not the slightest doubt that the commissioners were influenced in the purchase of the bridges by Powell's selection of them for public office. Lord Acton's famous aphorism that "Power corrupts and absolute power corrupts absolutely" is only relatively true, but the evidence abundantly justifies the deduction that Powell's political power exerted a corrupting influence on the freeholders and the bridge commissioners in the purchase of the bridges. *569 Not only did the freeholders and the commissioners fail to act with vigilance in the discharge of the duties imposed upon them by law, but the tractability of the commissioners was assured in advance of their appointment. The commissioners, knowing that Powell was one of the sellers and Wood their attorney, nevertheless approved the "package" deal and immediately upon their appointment carried out the successive steps rehearsed the previous evening in the hotel room in Philadelphia. They abdicated the functions of their office in advance of appointment by accepting unequivocally the plan prepared for them. Indeed, this acceptance was the indispensable condition precedent to their appointment. Instead of acting primarily for the benefit of the public, they served the interests of the sellers of the bridges. Such conduct is inimical to and inconsistent with the public welfare.
In Schefbauer v. Kearney, 57 N.J.L. 588 (Sup. Ct. 1895), Mr. Justice Lippincott said, at page 601, "If they exercise the power in good faith, in a bona fide manner, without abuse or corruption, then the court cannot interfere with the exercise of their judgment in the matter. They were not to exercise an arbitrary discretion, and over such an exercise of power the court would have ample control in order to defeat fraud or injustice, and to protect the public from the abuse of the power conferred, and from extortion and imposition. * * * The abuse of the power, contrary to common justice, becomes cognizable in the courts for correction."
"Every one is required to take notice of the extent of authority conferred by law on a person acting in an official capacity * * * and since ignorance of the law excuses no one, those who make a contract with public officers are bound to know whether the proper formalities have been observed." 43 Am. Jur., § 256, page 73. State v. Erie Railroad Co., supra. "In order to guard the public against losses and injuries arising from the fraud or mistake or rashness or indiscretion of their agents, the rule requires of all persons dealing with public officers the duty of inquiry as to their power and authority to bind the government; and persons so *570 dealing must necessarily be held to a recognition of the fact that government agents are bound to fairness and good faith as between themselves and their principal." Hume v. United States, 132 U.S. 406, 33 L.Ed. 393 (1889). "The municipal corporation cannot in any manner bind itself by any contract which is * * * against public policy, and, as stated, all persons contracting with the corporation are held to know the limitations in these respects." McQuillin on Municipal Corporations (3rd ed. 1950), vol. 10, § 29.04, page 165.
In intercourse "with those in authority, whether executive or legislative, touching the performance of their functions," the citizen "is bound to exhibit truth, frankness and integrity. Any departure from the line of rectitude in such cases, is not only bad in morals, but involves a public wrong." Trist v. Child, 88 U.S. 441, 22 L.Ed. 623 (1875).
The defendants, members of the sellers' syndicate, are to be held as active participants in the transaction. They knew of Powell's political power, which he demonstrated by selecting the members of the Commission and procuring their appointment by the County Board of Freeholders. These defendants met Yocum, Lichtenthal and Norcross, discussed the transaction with them and had it accepted before they were appointed and before there was a bridge commission. These defendants  and surely a lawyer of the stature claimed for their attorney, David M. Wood  must have known that such dealings are of highly doubtful propriety. As already stated, Wood ascertained through Powell the names of two of the commissioners and inserted them in the printed resolution before the Commission was created. The sellers must have realized the corrupting influence of Powell's political power when the commissioners-to-be appeared in the hotel room in Philadelphia and submissively accepted the proposed transaction. In the face of such an exhibition, they must have known that the usual clash of interests between a seller to obtain the highest price and a buyer to obtain the lowest price was eliminated. These defendants knew, or ought to have known, that the commissioners upon assumption of public *571 office became trustees for their principals, the County of Burlington and the State of New Jersey; that they were bound to act honestly, fairly and in good faith in their behalf. Nevertheless, they participated in what they knew or must have known was a corrupt arrangement.
Being counsel for the sellers, Wood ought not to have represented the commissioners,  their interests were conflicting. Morris v. Glaser, 106 N.J. Eq. 570 (Ch. 1929); affirmed, 110 N.J. Eq. 661 (E. & A. 1932). He directed concealment of this public transaction because of his personal conviction that public notice would produce nuisance litigation. Whatever justification there may be for secrecy and concealment in private deals does not apply to public affairs. Experience brings home to us the necessity for notice in public transactions. The following observation of Mr. Justice Brandeis extends to governmental matters: "Publicity is justly commended as a remedy for social and industrial diseases. Sunlight is said to be the best of disinfectants; electric light, the most efficient policeman." Brandeis, Other People's Money, page 62. The towering enemy of political corruption is publicity. An honest transaction does not shrink from publicity; it welcomes it. It is not withheld from public scrutiny, nor does it fear so-called nuisance litigation. A corrupt transaction is usually a secret operation which seeks to attain its ends not by normal political processes, but outside them.
R.S. 27:19-35 specifies that no contract in excess of $2,500 for the construction, repair or maintenance of bridges shall be awarded without advertisement, but then provides that "Contracts for the purchase of bridges may be made and executed without advertisement." The defendants argue that notice of the contract for the purchase of the bridges was not required. The plaintiffs, however, urge that the contract was for the purchase of stock of a corporation and not for the purchase of bridges. Strictly speaking, the commissioners did not purchase bridges. However, by the purchase of all *572 the stock of the corporation which owned the bridges, in effect they purchased the bridges.
In Kennelly v. Jersey City, 57 N.J.L. 293 (Sup. Ct. 1894), Mr. Justice Dixon said, "It is impossible to frame a universal rule for determining when individuals are absolutely entitled to notice of the proceedings of public agencies. Like `due process of law,' it seems to be a mixed question of abstract justice and established usage. Sometimes it is said that such notice is requisite in all judicial proceedings, but not in those which are legislative or ministerial. With regard, however, to the acts of corporate bodies invested with governmental powers, these terms are often very shadowy."
In Sears v. Atlantic City, 72 N.J.L. 435 (Sup. Ct. 1905); affirmed, 73 N.J.L. 710 (E. & A. 1906), Mr. Justice Swayze observed, 72 N.J.L. at page 436: "Some, probably most, of the city charters in this state require notice of intention to make public improvements to be given, and a provision for a hearing is usual, as far as I have observed, in the general legislation on the subject."
Generally, notice is only required if the statute directs that it be given. Wilson v. Karle, 42 N.J.L. 612 (E. & A. 1880); Bacon v. Elizabeth, 51 N.J.L. 246 (Sup. Ct. 1889); Moore v. Haddonfield, 62 N.J.L. 386 (E. & A. 1898); Burstiner v. East Orange, 100 N.J.L. 385 (E. & A. 1924); Whirl-O-Ball, Inc., v. Asbury Park, 136 N.J.L. 316 (E. & A. 1947).
The rule is thus stated in McQuillin, Municipal Corporations (3rd ed. 1950), vol. 13, § 37.40, page 147: "But sometimes notice is not required, as where the law does not so provide, or where the expense of the proposed improvement is paid for out of municipal revenue, and not by the levy of a special assessment or tax on the property benefited; in such case notice is not jurisdictional, but merely directory. * * *"
In my opinion, the statutory provision empowered the commissioners to dispense with advertisement if the honest exercise of discretion suggested such procedure. But, in the instant matter, the secrecy and concealment from the public were not so motivated. The proposition that a public transaction *573 of the kind under consideration should be negotiated with officials before their appointment and concluded without any notice to the public, but presented to it as a fait accompli, is as startling as it is novel in a democratic society. This is autocratic, not democratic procedure. The methods employed by the bridge commissioners and the freeholders manifested a palpable abuse of the discretion vested in them. Some of the defendants directed, others participated in the concealment from the public. It was urged upon the commissioners and freeholders by the defendant sellers, and is directly chargeable to them.
Not to be overlooked is that the time and place of the preliminary meetings and of the closing were arranged by the defendant sellers to suit their purposes, and contributed to the haste and concealment essential to their plan. The October 22, 1948, meeting of the Board of Freeholders was its last regular meeting before the November 1st deadline on the Tacony-Palmyra options, so that the defendant sellers had to have the necessary local action taken at that meeting. All other meetings were held beyond the territorial limits of the County of Burlington and the State of New Jersey  the preliminary meetings in Philadelphia, Pennsylvania, and the closing, in the City of New York.
The defendants strenuously argue that the transaction was financially profitable to the Bridge Commission and the County of Burlington. This argument, however, is untenable and entirely without merit. The determinant of the validity of a transaction is not financial profit, but whether it was negotiated and concluded in conformity with legal standards. It is immaterial that the transaction might prove profitable. Where any vitiating element exists that would tend to control or trammel the unbiased judgment of public officers, the test is the evil tendency, although no actual injury to the public may have resulted. Edwards v. Goldsboro, 53 S.E. 652, 4 L.R.A. (N.S.) 589 (N.C. Sup. 1906). When public officials in the performance of public duties are influenced by improper political considerations, not necessarily *574 confined to the dishonest use of money, they violate their oath of office and the public is deprived of the loyal and faithful services of its public officers. In the instant case, the public was so deprived. Hammerschmidt v. United States, 265 U.S. 182, 68 L.Ed. 968 (1923); Pan American, &c., Co. v. United States, 273 U.S. 456, 71 L.Ed. 734 (1926); Mammoth Oil Co. v. United States, 275 U.S. 13, 72 L.Ed. 137 (1927).
Moreover, the contention that the transaction does not result in financial loss to the public is not true. The deal would not have been concluded without the extinguishment of the State's right to acquire the bridges at a cost of approximately $5,000,000. The purchase price was to have been paid by the public who used the bridges, many of them residents of Burlington County. Thus, the traveling public, although at reduced tolls, was to pay $12,000,000 for what might have been acquired for approximately $5,000,000.
A contract contrary to public policy is illegal and void, however solemnly made. Brooks v. Cooper, 50 N.J. Eq. 761 (E. & A. 1893). "The meaning of the phrase `public policy' is vague and variable. Courts have not defined it with exactness and there is no fixed rule by which to determine what acts are repugnant to it. Lord Brougham's classic definition in Egerton v. Brownlow (4 H.L.C. 1,140; 10 Eng. Rep. 382, 415), that `public policy * * * is that principle of the law which holds that no subject can lawfully do that which has a tendency to be injurious to the public, or against the public good, which may be termed * * * the policy of the law, or public policy in relation to the administration of the law' has frequently been approved." Girard Trust Co. v. Schmitz, 129 N.J. Eq. 444 (Ch. 1941). "The principles and doctrine of public policy are matters of common professional knowledge. While the term is profound, as well as panacean in legal jurisprudence, it admits of no exact definition. Its virtue and vigor lies in its flexibility of application, and while reported cases furnish guides, they rarely are compelling in precedent." Fidelity Union Trust Co. v. Reeves, *575 96 N.J. Eq. 490 (Ch. 1924); affirmed, 98 N.J. Eq. 412 (E. & A. 1925). The term "public policy" is as difficult of definition as the word "fraud" or the term "public welfare." Pittsburgh, C., C. & St. L. Ry. Co. v. Kinney, 95 Ohio St. 64, 68, 115 N.E. 505, L.R.A. 1917D 641 (Sup. 1916); Fidelity & Deposit Co. v. Davis, 129 Kan. 790, 284 Pac. 430, 68 A.L.R. 321 (Sup. 1930).
"No contract, whatever its subject matter, can be sustained, which the law, upon reasonable grounds, forbids as inconsistent with the public interest, or as hurtful to the public order, or as detrimental to the common good. * * * The fundamental interests of the state must be secured; the common interest is of paramount concern. * * * Public policy is the public interest." Cameron v. International, &c., Union No. 384, 118 N.J. Eq. 11 (E. & A. 1934); McQuillin, Municipal Corporations (3rd ed. 1950), vol. 13, § 37.111, page 362.
The efficiency of the public service is a matter of vital concern to the public. All agreements which tend to introduce personal influence and solicitation as elements in procuring and influencing action by any department of the government are contrary to sound morals, lead to inefficiency in the public service and are illegal. "Any contract which contemplates conduct which will amount to imposition upon a public officer in the exercise of his discretion, is void. * * * Any contract by one acting in a public capacity, which restricts the free exercise of a discretion vested in him for the public good, is void." Greenhood on Public Policy, pages 336-337.
Principles are declared in definition, but evidenced in conduct. Citations of the practical application of the rule might be enlarged without rendering the reason of the rule any more apparent. We have here a startling illustration of conduct inimical to the public interest. The contract is, therefore, contrary to public policy and cannot be upheld. Hammerschmidt v. United States, supra; Pan American, &c., Co. v. United States, supra; Mammoth Oil Co. v. United States, *576 supra; Brooks v. Cooper, supra; Allen v. Commercial Casualty Ins. Co., 131 N.J.L. 475 (E. & A. 1944); Stone v. William Steinen Mfg. Co., 133 N.J.L. 593 (E. & A. 1945); Edwards v. Goldsboro, supra.
The sale of the bridges being contrary to public policy should be rescinded. The defendant members of the bond syndicate argue that they were not parties to this illegal transaction, that the bonds are valid obligations and that a complete restoration of the status quo is not possible. They press the argument that if the title to the bridges reverts to the seller, the Burlington-Bristol Bridge Company, the bonds will depreciate in value because the revenues of the bridges when owned by a private corporation are subject to federal income taxes. Conceding that a complete restoration of the status quo among all parties is difficult, this cannot be ground for refusing to set aside an illegal transaction. "Absolute and literal restoration of the parties to their former position is not required, and such restoration as is reasonably possible and demanded by the equities of the case is sufficient. * * * In equity, a contract may be rescinded, although the parties cannot be placed in status quo, where the clearest and strongest equity demands such relief and equity can still be done between the parties, and the rescinding party makes such restitution as is just and within his power. * * * The fact that the other party is unable to restore what he has received does not deprive the innocent party of the right to rescind." 17 C.J.S., Contracts, §§ 438 and 439, pages 920 and 924. The public policy of the State is not to be thwarted because of the inability to make exact restitution. United States v. Trinidad Coal & Coking Co., 137 U.S. 160, 34 L.Ed. 640 (1890); Causey v. United States, 240 U.S. 399, 60 L.Ed. 711 (1915).
For practical purposes, there are three sets of parties: the sellers of the bridges, composed of the syndicate members who negotiated and profited from the deal; the bond syndicate who financed it; and the Commission, the purchaser. There were necessarily two contracts, one for the purchase and one *577 for the bonds. In effect, the contracts constituted one transaction; one contract was dependent upon the other. The arrangements for both were made by the sellers and they were simultaneously concluded.
"Where a contract grows immediately out of and is connected with a prior illegal contract, the illegality of such prior contract will enter into the new contract and render it illegal." 17 C.J.S., Contracts, § 285, page 672. However, if a contract is merely collaterally connected with an unlawful purpose or act, it is enforceable although arising out of an illegal transaction. "Occasionally, there may also be cases where in spite of both parties sharing in the illegality of an executed transaction, public policy will be best served by rescission * * * if failure to rescind will affect not only the parties to the transaction, but will injure the public." Williston on Contracts (Rev. ed.), § 1787, page 5078.
Black on Rescission and Cancellation (2nd ed.), § 313, page 845, declares:
"But because a contract is tainted with illegality it does not follow that both parties must be considered as equally implicated nor that the policy of the law requires that relief should be denied to the one who is wholly or comparatively innocent. `If the contract is illegal,' says the Supreme Court of the United States, `affirmative relief against it will not be granted, at law or in equity, unless the contract remains executory, or unless the parties are considered not in equal fault. * * *' (St. Louis, V. & T.H.R. Co. v. Terre Haute & I.R. Co., 145 U.S. 393, 12 Sup. Ct. 953, 36 L.Ed. 748.) * * * But even where the parties are in pari delicto, relief may be in some exceptional cases be granted to one of them as against the other, and chiefly in cases where the undoing of the contract would promote the public interest, or where to withhold relief would to a greater extent offend the public morals or facilitate the perpetration of frauds."
Without declaring illegal the contract for the sale of the bonds by the Commission to the bond syndicate, I find the two contracts interrelated and interdependent. Piercing form for substance, the real purchaser of the bridges was the bond syndicate. Its members knew that the Commission had no property and that they would furnish the purchase price. They advanced $12,400,000, borrowed from the Chemical *578 Bank & Trust Company, to be repaid not on the credit of the County or the State, but entirely from revenues to be derived from the operation of the bridges. So that in practical effect they bought and paid for the bridges, paying $12,000,000 to the sellers and $400,000 to the Commission. They supplied not only the purchase price, but working capital.
"Upon principle, as well as by the weight of authority, it is settled that mere notice of facts, such as would have put a prudent person upon inquiry, is not sufficient to impeach the title of the holder of negotiable paper taken for value before maturity and his right to recover can be defeated only by proof of such circumstances as show * * * knowledge of some infirmity * * * as that his conduct in taking it was fraudulent." National Bank of Republic v. Young, 41 N.J. Eq. 531, 538 (E. & A. 1886). "Whenever the principal, if acting in the matter for himself, would have received the notice, the knowledge of his agent shall be chargeable to him." Sooy v. State, 41 N.J.L. 394 (E. & A. 1879); Vulcan Detinning Co. v. American Can Co., 72 N.J. Eq. 387 (E. & A. 1906); Hollingsworth v. Lederer, 125 N.J. Eq. 193 (E. & A. 1938).
The defendants, Ketcham and Nongard, were members of the selling syndicate and also of the bond syndicate; in fact, initially the bonds were awarded to them alone by their contract with the Commission. Ketcham and Nongard participated directly in the illegal sale. Significantly, neither testified at the trial.
When a loan is made to a public agency, usual and normal procedure would require at least some inquiry or investigation, conference or dealings by the lender with the borrower on an official level and through official channels. The Chemical Bank & Trust Company and B.J. Van Ingen & Co., Inc., knew enough of the particulars of the transaction to have put them on notice and investigation. Nevertheless, they made no inquiry and had no dealings or negotiations whatsoever with any public official of the County of Burlington or the State of New Jersey through official channels or in any official *579 manner. The other members of the bond syndicate likewise made no investigation or inquiry, and although at their first meeting warning came to them through the public press, they bought the bonds. Notwithstanding such neglect, rescission of the illegal sale of the bridges should be resolved upon the most equitable terms.
To effectuate this end, I conclude:
I. The Burlington County Bridge Commission shall surrender and restore all that it received, namely:
(a) it shall reconvey title to the bridges to the seller, the Burlington-Bristol Bridge Company;
(b) it shall retransfer the stock to the respective sellers thereof;
(c) it shall repay to the bondholders the sum of $400,000, together with the net revenues from the operation of the bridges from the time of their acquisition;
(d) the sum of approximately $550,000 which was in the treasury of the Burlington-Bristol Bridge Company on October 22, 1948, shall be returned thereto and be subject to the order of the court;
(e) the commissioners shall resign as officers and directors of the Burlington-Bristol Bridge Company;
(f) the commissioners should account for the receipts and disbursements of the Commission from October 22, 1948.
Thereupon, the Burlington County Bridge Commission and the commissioners shall have restored the property and moneys they received, and the Burlington County Bridge Commission shall be relieved from any obligation under its contract with the defendants.
II. The Burlington-Bristol Bridge Company, the seller, and the members of the bridge sellers' syndicate, the recipients of the purchase money, shall repay to the bondholders all moneys received from them; each shall disgorge and be required to repay such part of the purchase price as each received.
*580 III. The bondholders
(a) may be subrogated to the rights of the mortgagees or other holders of liens on the bridges on October 22, 1948, to the extent that moneys of the bondholders were used to pay off or discharge such encumbrances; and
(b) shall have a lien on the revenues of the bridges for the balance of the bond issue until repayment thereof; expressly, subject, however, to the rights of the State of New Jersey to acquire the bridges in accordance with law.
IV. All parties will be required and directed to take such steps or action as may be necessary to carry the within conclusions into effect.
V. The right of the State of New Jersey to acquire the bridges at the price and upon the terms provided by statute remains unaffected, because ownership of the bridges is to be revested in the Burlington-Bristol Bridge Company, a private corporation. If the State requires further protection, the Legislature can provide it.
The defendants have challenged the right of the plaintiffs to maintain this proceeding. If express authority were needed, the Constitution of 1947 provides it. Article V, Section I, paragraph 11, declares: "The Governor shall take care that the laws be faithfully executed. To this end he shall have power, by appropriate action or proceeding in the courts brought in the name of the State, to enforce compliance with any constitutional or legislative mandate, or to restrain violation of any constitutional or legislative power or duty, by any officer, department or agency of the State; but this power shall not be construed to authorize any action or proceeding against the Legislature."
The proofs do not establish that Robert M. Sherritt or the Sarjem Corporation participated in the illegal transaction, and, accordingly, as to them the complaint will be dismissed.
Judgment accordingly.