CONGRESS FACTORS, a Pennsylvania Corporation, Plaintiff,

v.

MALDEN MILLS INCORPORATED, a Massachusetts Corporation, Defendant.

Civ. No. 1073–69.

United States District Court, D. New Jersey.

Oct. 4, 1971.

Cole, Berman & Belsky by Bernard L. Belsky, Paterson, N. J., for plaintiff.

Lasser, Lasser, Sarokin & Hochman by H. Lee Sarokin, Newark, N. J., for defendant.

## MEMORANDUM OPINION

LACEY, District Judge:

Congress Factors, a Pennsylvania corporation (Congress), sues for alleged breach of its written factoring agreement with American Velour Mills, Inc., a New Jersey corporation (American); and it claims as damages commissions it would have earned had American's accounts receivable been factored with it between November 30, 1968, and June 29, 1969.[1] Jurisdiction lies under 28 U.S.C. § 1332.

Malden Mills Incorporated, a Massachusetts corporation (Malden), is the named defendant because of its written agreement guarantying American's obligations under the aforesaid factoring agreement.

The principal issues are whether the factoring agreement was orally terminated; and whether the plaintiff's conduct, in November, 1968, and thereafter, estops it from prevailing on its claim.

A non-jury trial was had herein on September 22, 1971. This Memorandum Opinion will first detail the testimony. Thereafter, in opinion form, Findings of Fact and Conclusions of Law will be set forth, pursuant to Rule 52(a) of the Federal Rules of Civil Procedure.

## THE TESTIMONY

On June 29, 1967, Congress and American entered into a factoring agreement, under which Congress was to factor all of American's accounts receivables, for a term of one year, with an automatic renewal each year unless either party gave written notice of termination to the other party on or before sixty (60) days prior to the expiration date in any year.

At or about the time of the signing of the factoring agreement, American was merged into the defendant Malden; and Malden assumed liability for American's contractual obligations and liabilities and guaranteed American's performance under the aforesaid factoring agreement.

Harmony prevailed until November 30, 1968. Thereafter, American receivables went not to Congress, but to another company. Defendant contends that this change was with the knowledge and consent of Congress and followed an oral agreement terminating the factoring agreement. Plaintiff not only denies oral termination; it also maintains that New York law (which the parties agree applies) bars oral termination under the instant circumstances.

It is noted that the defendant, notwithstanding its assertion of the oral agreement, and presumably out of an abundance of caution, did by letter of April 18, 1969, formally terminate the factoring agreement pursuant to its terms.

Turning to the events which generated the dispute, the principals therein were the litigants' presidents, Mr. Goldman of Congress and Mr. Feuerstein of Malden, each of whom testified as the sole witness for his side. In substantial part their testimony was similar, or at least, reconcilable: That American had been or was being merged out of existence; that Malden, the surviving entity, had arranged for a $4 million loan from Boston First National Bank; that the Boston bank had demanded all of Malden's factoring business for its own factoring house; that Malden management had succeeded in having the American receivables excepted from this demand; that, out of a long standing friendship and business relationship, Aaron Feuerstein's father, obviously a strong force in Malden, wanted the American factoring business to go to another factor,

1. The parties agree that accounts receivable totalling $3,166,780 would have been factored under the agreement if American had continued to factor with the plaintiff during the time interval indicated. Plaintiff sues for the full 1% commission provided for in ¶ 7 of the factoring agreement, or $31,667.80 (Ex. P–1), with 6% interest since June 29, 1969.

Meinhard Commercial; and that it was to discuss these matters that Mr. Feuerstein initiated certain telephone conversations and conferences with Mr. Goldman.

The critical meetings were in November, 1968. Aaron Feuerstein met twice with Robert Goldman and the latter's father, once at lunch and thereafter on another day, in Congress' office.[2] These meetings were preceded, and possibly arranged by, a telephone call from Aaron Feuerstein to Robert Goldman, memorialized by Mr. Goldman in his file as follows (Ex. P–4):

> Aaron Feuerstein called to ask if he could draw down the full amount of his credit balance with us, to which the writer agreed. He went on to say that Malden Mills is working out a banking relationship with First National Bank of Boston in conjunction with their present arrangement with New England Merchants. He mentioned that there is considerable pressure by First of Boston to pull the factoring business out of Meinhard and Congress and bring it into their own company.
> \* \* \*

Mr. Goldman, in testifying, denied that Mr. Feuerstein had ever asked him, or that he had ever volunteered, to terminate the factoring agreement. While maintaining that termination had never been discussed, Mr. Goldman acknowledged that it was an "obvious implication that Feuerstein was contemplating termination." Mr. Feuerstein stated that termi-

nation was discussed in these terms: That because of his father, he had no alternative other than to attempt to obtain the Goldmans' consent to terminate the factoring agreement; that Robert Goldman said "he had no intention" of insisting upon literal compliance with the termination clause of their agreement,[3] that he was "not that kind of a factor," that, the decision having been made, "it is wiser to terminate," that Mr. Feuerstein "should go forward immediately with the transfer," and that the attorneys "could work out the documents." Mr. Feuerstein then asked what "immediately" meant; and Mr. Goldman answered "tomorrow." On this note, the meeting ended.

Mr. Goldman testified that, even following their last meeting, he had no basis for believing Congress would after November 30, 1968, receive no more American receivables. He discovered in December, 1968, "when someone told him," that such was the case, and he then "assumed" the receivables were going to another factor. He spoke with Mr. Feuerstein on January 10, 1969, a conversation again preserved by a file memorandum (Ex. P–5):

> Called Aaron Feuerstein inasmuch as our $400,000.00 real estate mortgage has not been paid off even though we stopped getting factored sales at the end of November. Feuerstein apologized for the delay and promised to get on to it promptly so that it will be cleared up in the next couple of

---

2. Mr. Goldman put these meetings on successive days, explaining that the second day's meeting was necessary "because we ran out of time at lunch." Mr. Feuerstein stated several days intervened between the first and second meeting: He had discussed at lunch with the Goldmans the overall problem and was asked by Mr. Robert Goldman to try once more to convince the senior Feuerstein to leave the factoring business with Congress; he did, without success, and then met with the Goldmans on a second occasion to advise them of his father's adamant position, and that "we would give new factoring business to Congress Factors as we grew."

3. *See* Factoring Agreement, ¶ 12 (Ex. P–1):

> 12. This agreement shall begin as of the date hereof and shall continue until June 29, 1968, and thereafter shall be automatically renewed from year to year unless and until in any year written notice by registered mail shall be given by either party to the other on or before sixty (60) days before expiration in any year of an election to terminate this agreement on June 29th, in which event this agreement shall so terminate.

weeks. In the meantime, Feuerstein once again promised that the next factoring business that is available out of the Malden complex will come our way.[4]

Mr. Goldman stated, concerning this conversation, his concern about the unpaid mortgage, which was "tied in" to the factoring agreement: " * * * we cross collateralize them;" and he added that the loan came due when "the account receivables terminate." [5]

Mr. Goldman again raised the question of the $400,000 loan, in a call to Mr. Langerman, counsel for Malden, on February 7, 1969. His file memorandum reads (Ex. P–6):

> Spoke to Dick Langerman, attorney for Malden Mills and American Velour Mills, and advised him that if there is a substantially greater delay in cleaning up our fixed asset loan on American Velour Mills, that we will make demand for the factoring commissions being lost since we last got American Velour Mills sales. Langerman assured us that the loan will be paid off by the end of next week.

The $400,000 loan was paid in full in June, 1969.

Malden, following the November, 1968, Goldman-Feuerstein meetings, and, according to Mr. Feuerstein, as a result of Mr. Goldman's consent, transferred the American factoring business to Meinhard Commercial.

Malden's transferring of American's receivables was not evident immediately to Congress' top management because American's business was a relatively in-significant part of Congress' total volume of factored receivables. In fact, loss of the American business resulted in neither layoffs nor diminution of overhead costs at Congress. Of course, the corollary is true: Congress produced no proofs that it had been necessary to hire extra personnel or assume added costs, when it took on the American account; and thus there was no consequential loss to it when American's factoring ended. Plaintiff claimed as damages, therefore, the full amount of its lost commissions, without any deduction for handling expenses.

Following the second of the two November meetings, Mr. Feuerstein testified, he called company counsel, Mr. Langerman, to tell him Mr. Goldman had agreed to termination. Mr. Langerman wanted to confirm this in writing; however, Mr. Feuerstein directed otherwise because Mr. Goldman "had been a gentleman" and to have written him on this would, in Mr. Feuerstein's judgment, "have been insulting to Mr. Goldman."

The foregoing testimony must be construed in the light of a provision in the factoring agreement (¶15) that the agreement "shall be construed according to and be governed by the laws of the State of New York."

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

### I

A court, in a bench trial, functioning as a trier of the facts, often must resolve conflicting testimony.[6] Such is the case here. The unpleasant task of determining where the truth lies as between

---

4. The Guarantee Agreement (Ex. P–3) refers to a "sum evidenced by a Promissory Note of even date herewith given by * * * [American] to Congress * * * and in the original principal amount of Four Hundred Thousand Dollars ($400,000.00) * * *." Mr. Goldman also testified about this loan as a "mortgage loan" which was granted at the time the factoring agreement was entered into on June 29, 1967.

5. See ¶ 13 of Factoring Agreement (Ex. P–1): " * * * Upon any termination of this agreement, all sums due from you to us shall be deemed to be immediately due and payable to us * * *." The only "termination" at this time was that alleged by Malden, the oral termination. Absent this, there was no event which had occurred to trigger the due date of this loan.

6. See B. Kristein, A Man's Reach—The Philosophy of Judge Jerome Frank, (1965) 227 et seq.

the Feuerstein and Goldman versions of their two conferences is unavoidable.

Both men were highly intelligent, articulate and poised. Mindful during their testimony of my ultimate duty of fact finding, I scrutinized carefully and searchingly not only what they said, but how they said it. I shall not enumerate here the tests for ascertaining credibility which courts can and do apply.[7] Suffice it to say that, using these traditional tests, I have concluded that I must reject that version offered by Mr. Goldman, and accept that offered by Mr. Feuerstein.

In addition to the Court's subjective reaction to the witnesses' demeanor, the nature of their response to the same question when put first on direct and later on cross examination, their bearing on the witness stand, and the general attitude reflected by them, all of which led, in my opinion, to accepting Mr. Feuerstein's testimony as true, there are certain analytical reasons for my decision, reasons which I now set forth.

Mr. Goldman's testimony that the word "termination" or its substantial equivalent was never used in the aforesaid conferences strains credulity. He knew that this was the primary, if not the sole purpose, for their meeting, for he knew the senior Feuerstein was pressuring his son to transfer the factoring to another company. I find it inconceivable, or, at least, inherently improbable, that the subject of termination or cancellation did not arise, at least as a suggested solution, although Mr. Goldman says it arose not at all.

Mr. Goldman also stated that, after November 30, 1968, he was unaware of American's receivables having been transferred to another company until a time in December when someone told him about it. He then attempted repeatedly but without success to reach Mr. Feuerstein by telephone to find out why, according to Mr. Goldman, Malden had breached the factoring agreement. If this is so, he had a ready solution at hand, to write a letter to Mr. Feuerstein complaining of the breach. Yet he did not do this, an omission suggesting that he knew in November that Malden was dropping Congress as a factor. Moreover, Mr. Goldman's memorandum of his January 10, 1969, conversation with Mr. Feuerstein makes no mention of his inability to reach the latter previously. Even more significant, the memorandum reflects not a protest of a breach of a factoring agreement, but rather that "our $400,-000.00 real estate mortgage has not been paid off even though we stopped getting factored sales at the end of November." Mr. Goldman was in fact saying that, the factoring agreement having been terminated, the mortgage agreement now called for repayment of the $400,000. As he testified, the loan came due when "the account receivables terminate."[8] He discussed the mortgage loan, but did not question at all why the receivables had stopped; he neither claimed breach of contract nor threatened suit; and did not demand performance under the factoring agreement. His conduct was consistent only with Mr. Feuerstein's testimony that the parties had agreed orally to terminate in November, 1968.

There is another pertinent portion of the January 10 memorandum: " * * * Feuerstein apologized for the delay and promised to get on it promptly so that it will be cleared up in the next couple of weeks." Obviously there was an earlier agreement relating to prompt payment of the mortgage loan upon termination of the factoring agreement; and this demand was that the mortgage loan be repaid, not that the factoring be reinstated. Further, the Goldman memorandum of February 7, 1969, of his telephone conversation with Malden's counsel, Mr. Langerman, shows the demand pressed by Mr. Goldman was for payment of "our fixed asset loan," and that Mr. Goldman threatened "demand for the factoring commissions being lost since we last got American Velour Mills sales" if there is

---

7. Joseph v. Donover Co., Inc., 261 F.2d 812, 819 et seq. (9 Cir. 1959).

8. See ¶ 13 of Factoring Agreement (Ex. P–1); and see footnote 1, supra.

"a substantially greater delay in cleaning up" the $400,000 loan. This is, like the contents of the January 10 memorandum, totally inconsistent with Mr. Goldman's testimony.

Returning briefly to the Feuerstein-Goldman conversation of January 10, Mr. Goldman notes "Feuerstein *once again* promised that the next factoring business that is available out of the Malden complex will come our way." (Emphasis supplied). This is a most important disclosure. Mr. Goldman in his trial testimony did not disclose that a promise to give to Congress "the next factoring business that is available out of the Malden Complex" had been made to him by Mr. Feuerstein prior to January 10, 1969. Yet obviously this promise had previously been made, and made at one of the two November, 1968, conferences (Mr. Goldman had not spoken to Mr. Feuerstein after their second meeting). Mr. Feuerstein, on his part, supplied when this promise was made: It was at the second conference he conveyed this promise, at the same conference, according to him, that he explained why his father wanted to cancel the agreement and Mr. Goldman agreed to do so, and I so find. Beyond the mere making of the statement is the significance of its import. In the light of common experience, it can be adjudged to have been a promise to show Malden's appreciation for Congress having agreed to release Malden from the factoring agreement, furnishing further support for Mr. Feuerstein's testimony that termination was agreed upon at that point in time.

It is unnecessary to reiterate Mr. Feuerstein's testimony, hereabove already detailed, which, as I have indicated, I find to be true. That he had a right to believe and did believe, when he left the second conference with the Goldmans, that he was free to transfer American receivables to Meinhard Commercial I also find to be a fact. Had he been led to any other conclusion he had only to wait till June, 1969, when, by virtue of an earlier 60–day notice, the factoring agreement would not automatically renew it-

self. It would have been most unreasonable conduct to have moved the receivables, on not substantially better terms, and solely on the basis of friendship, and run the risk of still being obliged to pay Congress for no services at all.

As a further analytical step, assuming Mr. Goldman's version of the November meetings, that is, that he was never asked to consent to termination, if after the second November meeting Mr. Feuerstein still was being pressured by his father to transfer American receivables, would not Mr. Feuerstein have gone back to Mr. Goldman before transferring the accounts? Still assuming Mr. Goldman's version, the request to terminate not having been raised, Mr. Feuerstein would have been acting irrationally by incurring risk of duplicate expense without at least trying to get a consent to termination.

For the foregoing reasons, first, my own examination of what Mr. Goldman said and how he said it (that is, his demeanor, his method of response, and the like), and second, the analytical process to which I have given lengthy expression, I find as a fact that Mr. Feuerstein did ask for Congress' consent to terminate, and that this consent was given. I further find that Malden transferred American's receivables as a result of what was said and done by Mr. Goldman in November, 1968; and that, thereafter, by his conduct in January and February, Mr. Goldman continued to lead defendant to believe he did not object to the aforesaid transfer.

II

The foregoing findings of fact must now be valued in the light of appropriate principles of law.

■ The plaintiff contends that, even if there were an oral termination in November, 1968, such is *nullius juris* in that (a) the factoring agreement required a writing to terminate it; (b) under the agreement itself, the meaning and validity of this requirement must be determined by the substantive law of New York; and (c) New York statutory

and decisional law bar oral termination of an agreement which, by its own terms, requires its termination to be in writing. I shall examine each of these contentions in turn, but before doing so, the not unusual issue of what jurisdiction's law is to be applied must be resolved. The initial step in that regard requires ascertainment of the conflict of laws rules which New Jersey state courts would apply, confronted with this, a contract case. Klaxon Co. v. Stentor Electric Mfg. Co., 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941); Purcell v. Kapelski, 444 F.2d 380, 381 (3 Cir. 1971), cert. denied, 92 S.Ct. 283 (1971).

■ Absent a strong public policy contravened by so doing, New Jersey courts normally will apply the law of a sister state in deciding a question of construction or validity of a contract made and performed in that state.[9] Colozzi v. Bevko, Inc., 17 N.J. 194, 202, 110 A.2d 545, 549 (1955); Farris Engineering Corp. v. Service Bureau Corp., 406 F.2d 519, 520 (3 Cir. 1969); Award Incentives, Inc. v. Van Rooyen, 263 F.2d 173, 176–177 (3 Cir. 1959); *and see* Lobek v. Gross, 2 N.J. 100, 102, 65 A.2d 744, 745 (1949); In re Lea Fabrics, 226 F.Supp. 232, 237 (D.N.J. 1964).

■ New York is the situs of all of the primary contacts involved in the making and performance of the factoring agreement in suit. Also, the parties to

the factoring agreement provided that it was to be "construed according to and be governed by the laws of the State of New York." (¶15—Ex. P–1).[10] Therefore, absent an opposing public policy, the substantive law of New York must be applied to the facts found herein.

■ Plaintiff contends that the agreement in suit requires it be terminated only in writing. I agree. (Ex. P–1; ¶12).

No public policy appearing to foreclose it,[11] New York statutory and decisional law, applied to this contractual provision, provides a statute which by its terms enforces such a written termination requirement. New York General Obligations Law § 15–301, subd. 4 provides:

If a written agreement or other written instrument contains a provision for termination or discharge on written notice by one or either party, the requirement that such notice be in writing cannot be waived except by a writing signed by the party against whom enforcement of the waiver is sought or by his agent.

The purpose of this statute was made clear by the report and recommendation of the New York Law Revision Commission when it drafted a predecessor statute:

"The purpose of the statute is to permit parties to a contract to protect themselves from false claims either of

**9.** For the meaning, and discussion of, "public policy," *see* cases collected and reviewed in Driscoll v. Burlington-Bristol Bridge Co., 10 N.J.Super. 545, 77 A.2d 255 (Ch.Div.1950), modified 8 N.J. 433, 86 A.2d 201 (1952), cert. denied, 344 U.S. 838, 73 S.Ct. 25, 97 L.Ed. 652 (1952); *and see* 6A Corbin, Contracts, § 1375 at 19, referring to Winfield, Public Policy and the English Common Law, 42 Harv.L.Rev. 76. *Cf.* Mellk v. Sarahson, 49 N.J. 226, 229 A.2d 625 (1967), rejecting an Ohio automobile guest statute because it was repugnant to New Jersey's public policy and the sister state, where the tort occurred, had no real interest in the application of its statute.

**10.** Such a reference will normally be honored by the New Jersey courts. Farris

Engineering Corp. v. Service Bureau Corp., *supra*, 406 F.2d at 521: " * * * The New Jersey courts seem disposed to give effect to such a provision where the law chosen by the parties is that of a state to which the transaction is significantly related. * * * "; Restatement (Second) of Conflicts of Laws (1971), § 187(2); In re Lea Fabrics, Inc., *supra*, 226 F.Supp. at 273, *Cf.* N.J. S.A. 12A:9–103.

**11.** N.J.S.A. 12A:2–209(2), as a part of the Uniform Commercial Code, while applicable only to "goods," shows a policy in New Jersey of enforcing written termination requirements.

oral change or of oral termination of the contract. To accomplish this purpose, the Commission believes that the statute should be amended to make it clear that * * * (b) where there is a stipulation against oral termination of the contract, the contract cannot be discharged by executory agreement unless the executory agreement is in writing and signed by the party against whom it is sought to be enforced, and a termination by mutual assent or abandonment may be accomplished only by a writing or by an executed accord and satisfaction * *." Recommendation of the Law Revision Commission to the Legislature Relating to the Change, Discharge, or Termination of Contracts Prohibiting Oral Change or Termination, 1952, at 9.

*See* Bakhshandeh v. American Cyanamid Company, 8 A.D.2d 35, 185 N.Y.S.2d 635 (1959), aff'd. 8 N.Y.2d 981, 204 N.Y.S. 2d 881, 169 N.E.2d 188 (1960); *see also* 34 N.Y.U.L.Rev. 1435, 1436 (1960).

Our review of New York law, however, cannot stop here.[12]

Beginning in an era pre-dating the statutory enforcement of the written termination requirement, and dealing with the contractual provision itself, as well as with the parol evidence interdiction of oral changes of written agreements, New York decisional law has adopted and applied the doctrine of estoppel to ameliorate, under appropriate circumstances, what would otherwise be an inequitable result.[13]

The basis of such New York law is to be found in the reasoning of then Judge

Cardozo in his concurrence in Imperator Realty v. Tull, 228 N.Y. 447, 127 N.E. 263 (1920). This case presented the issue of whether there could be an oral agreement to modify a contract for the exchange of real estate in violation of the statute of frauds. Judge Cardozo reasoned that, while such a contract and its modifications must be in writing, " * * * There may be procurement or encouragement of a departure from literal performance which will forbid the assertion that the departure was a wrong. * * * " 228 N.Y. at 455, 127 N.E. at 266.[14]

The defendant properly raised the affirmative defense of estoppel in its pleadings [F.R.Civ.P. 8(c)]. The doctrine of estoppel, in cases involving this same New York statute and its predecessor statute, has been successfully interposed. Thus, in Gray v. Met Contracting Corp., 4 A.D. 2d 495, 167 N.Y.S.2d 498, 501 (1957), it was stated:

> * * * Such an estoppel would not be in conflict with Section 33–c, Personal Property Law, since it would not constitute an oral modification of a written contract, but the application of an ancient equitable principle whereby a person whose conduct had induced reliance thereon may not thereafter bring an action which is inconsistent with that conduct. * * *

*See also* Meadow Brook National Bank v. Feraca, 33 Misc.2d 616, 224 N.Y.S.2d 846, 850 (Sup.Ct. Special Term, Nassau Cty. 1962); Rosenbaum-Grinell Inc. v. Bart Schwartz International Textiles, Ltd., 15 Misc.2d 450, 182 N.Y.S.2d 441, 442 (Sup.Ct. Special Term, Part I, 1958);

12. 28 U.S.C. § 1652 provides: "The laws of the several states * * * shall be regarded as rules of decision in civil actions in the courts of the United States * * *." *And see* Uniform Judicial Notice of Foreign Law Act, N.J.S.A. 2A:82–27; and F.R.Civ.P. 43(a) admitting evidence admissible "under the rules of evidence applied in the courts of general jurisdiction of the state in which the United States court is held * * *."

13. N.J.S.A. 12A:1–103, as a part of the Uniform Commercial Code, provides for the preservation of the " * * * prin-ciples of law and equity, including * * * estoppel * * *." The defendant has properly raised this affirmative defense in accordance with F.R.Civ.P. 8(c).

14. *See also*, Dunn v. Steubing, 120 N.Y. 232, 237, 24 N.E. 315, 316 (1890): " * * * A party to a contract containing a provision that it shall not be altered, modified, or changed, except by a written agreement signed by both parties, may, by conduct, estop himself from enforcing the provision against a party who has acted on and relied upon the conduct. * * * "

Becker Pretzel Bakeries v. Universal Oven Co., 279 F.Supp. 893, 898 (D.Md. 1968), applying New York General Obligations Law 15–301, and 2 Corbin, Contracts, § 310, at 111.

My findings of fact make particularly pertinent the following frequently cited passage from 3 Pomeroy's Equity Jurisprudence (5th ed. 1941), at 189, in which equitable estoppel is defined as arising from:[15]

> \* \* \* [T]he effect of the voluntary conduct of a party whereby he is absolutely precluded, both at law and in equity, from asserting rights which might perhaps have otherwise existed, either of property, of contract, or of remedy, as against another person, who has in good faith relied upon such conduct, and has been led thereby to change his position for the worse, and who on his part acquires some corresponding right, either of property, of contract, or of remedy.

This classical definition of estoppel has been, of course, long that followed in New York. *See* Metropolitan Life Ins. Co. v. Childs Co., 230 N.Y. 285, 292–293, 130 N.E. 295, 298 (1921):

> An estoppel rests upon the word or deed of one party upon which another rightfully relies, and, so relying, changes his position to his injury. When this occurs it would be inequitable to permit the first to enforce what would have been his rights under other circumstances. \* \* \*[16]

In view of the foregoing, I conclude:

1. There was an oral agreement achieved between the parties to terminate their factoring agreement.

 2. The conduct of the plaintiff from the time of the second conference between Messrs. Goldman and Feuerstein was such as to create an estoppel which effectively bars plaintiff from standing upon New York General Obligations Law 15–301.

Accordingly, it is determined that the plaintiff's claim must be denied.

An appropriate form of judgment, providing for costs, is to be submitted.

---

15. *See:* Highway Trailer Co. v. Donna Motor Lines, Inc., 46 N.J. 442, 449, 217 A.2d 617, 621 (1966); cert. denied sub nom. Mount Vernon Fire Insurance Co. v. Highway Trailer Co., 385 U.S. 834, 87 S.Ct. 77, 17 L.Ed.2d 68 (1966); *see also* West New Jersey Title & Guaranty Co. v. Industrial Trust Co., 27 N.J. 144, 153, 141 A.2d 782, 787 (1958).

16. This definition is still the law of New York: Selzer v. Baker, 295 N.Y. 145, 149, 65 N.E.2d 752, 753 (1946); and Ryder Truck Rental, Inc. v. Williamstown Wire & Cable Co., 62 Misc.2d 848, 309 N.Y.S.2d 508, 510 (Sup.Ct. Trial Term Onondaga Cty. 1970). *See,* on the duty to predict under Erie, Samuel J. Creswell Iron Works, Inc. v. Housing Authority of Camden, 449 F.2d 557 (3 Cir. 1971). I predict the highest courts of New Jersey and New York would hold estoppel to apply to New York General Obligations Law 15–301.